UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID BUTLER,                     )
                                  )
              Plaintiff,          )
      v.                          )          CIVIL ACTION
                                  )          NO. 12-11054-JGD
SHIRAZ BALOLIA,                   )
                                  )
              Defendant.          )

# MEMORANDUM OF DECISION AND ORDER ON
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

June 1, 2017

DEIN, U.S.M.J.

## I. INTRODUCTION

This action arises out of a failed effort to negotiate an agreement for the purchase and
sale of patents and technology, known as the "Whirlwind" technology, relating to safety devices
for cutting tools and saws.  The plaintiff, David Butler ("Butler"), developed the technology and
owns the associated patent rights.  The defendant, Shiraz Balolia ("Balolia"), is the president of
Grizzly Industrial, Inc., a company that sells woodworking and metal working machinery.  In
April 2012, the parties entered into a Letter of Intent ("LOI") pursuant to which they expressed
their intent to use their best efforts to negotiate and enter into a separate Purchase Agreement
for the purchase and sale of the Whirlwind technology at a price of $2.1 million.  However,
disputes between the parties arose shortly thereafter, and no Purchase Agreement was ever
executed.  By his claims in this action, Butler is seeking to hold Balolia liable for the alleged
breach of his obligations under the terms of the LOI.

The matter is presently before the court on the "Defendant's Motion for Summary Judgment" (Docket No. 114). By his motion, Balolia is seeking summary judgment, pursuant to Fed. R. Civ. P. 56, with respect to all of Butler's outstanding claims against him. The claims at issue are set forth in Butler's Second Amended Complaint. They include a claim for a declaratory judgment that the LOI constitutes a binding and enforceable agreement for the purchase and sale of the Whirlwind technology (Count I). They also include claims for breach of contract (Count II) and breach of the implied covenant of good faith and fair dealing (Count III).[1]

For all the reasons detailed below, the motion for summary judgment is ALLOWED IN PART and DENIED IN PART. Specifically, this court finds that Butler's declaratory judgment claim is foreclosed by both the law of the case and the unambiguous language of the LOI, which establishes that no enforceable purchase agreement existed, and that his claim for breach of the implied covenant of good faith and fair dealing is redundant of his claim for breach of contract. Accordingly, Balolia's motion is allowed with respect to Counts I and III. With respect to Count II, however, this court finds that summary judgment is not warranted on the plaintiff's claim that Balolia breached the LOI by failing to negotiate in good faith. Most of the relevant facts are not in dispute, but the parties' respective views of those facts differ widely. While Balolia relies on the evidence of record to show that he had legitimate concerns about buying Butler's technology, which led him to demand a reduction in the purchase price set forth in the LOI, Butler relies on many of the same facts to argue that Balolia's concerns were nothing more than a pretext to demand unreasonable financial terms that were inconsistent with the LOI and

---

[1] Count IV of the Second Amended Complaint, which consists of a claim for violation of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86 et seq., was dismissed on April 21, 2016. (See Docket No. 106).

had no legitimate business justification. Thus, the parties dispute whether Balolia complied

with his obligation to use his best efforts to negotiate a purchase agreement and whether his

conduct amounted to a lack of good faith. Because a jury viewing the evidence in the light most

favorable to the plaintiff could find that Balolia breached the LOI by failing to negotiate the

terms of a separate Purchase Agreement in good faith, the defendant has not established that

he is entitled to summary judgment on the claim for breach of contract. Therefore, and for all

the reasons detailed below, Balolia's motion is denied with respect to Count II of the Second

Amended Complaint.

## II. **STATEMENT OF FACTS**[2]

The following facts, which are relevant to the defendant's motion for summary

judgment, are undisputed unless otherwise indicated.[3]

### **The Parties**

The plaintiff, Butler, is a retired engineer who resides in Massachusetts. (DF ¶¶ 2, 3).

He is also an inventor who spent years researching and developing the Whirlwind technology.

(PR ¶ 3). This technology is comprised of safety devices for cutting tools such as table saws,

---

[2] Unless otherwise indicated, the facts are derived from the following materials: (1) the Defendant's Statement of Undisputed Facts ("DF") (Docket No. 116); (2) the exhibits attached to the Declaration of Laura L. Carroll in Support of Defendants' Motion for Summary Judgment ("Def. Ex. __") (Docket No. 117); (3) the Plaintiff's Response to Defendant's Statement of Undisputed Facts ("PR") (Docket No. 123); (4) the Plaintiff's Statement of Additional Material Facts ("PF") (Docket No. 123); (5) the exhibits attached to the Declaration of Michael J. Lambert in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. Ex. __") (Docket No. 124); and (6) the "Defendant's Response to Plaintiff's Statement of Additional Material Facts ("DR") (Docket No. 131).

[3] Pursuant to Local Rule 56.1, both motions for summary judgment and oppositions to such motions "shall include a concise statement of the material facts ... with page references to affidavits, depositions and other documentation." Accordingly, this court has not credited any facts contained in the parties' statements of facts that are not supported by citations to the evidentiary record.

and includes what is known as "flesh sensing" technology.  (PR ¶ 3; <u>see also</u> Def. Ex. 3).  Butler

owns several patents and patent applications relating to the Whirlwind technology.  (DF ¶ 3; PR

¶ 3).

The defendant, Balolia, resides in Bellingham, Washington.  (DF ¶ 4).  He is the president

of Grizzly Industrial, Inc, a company that sells woodworking and metal working machinery and

equipment.  (DF ¶ 5).  The record indicates that Balolia has long been interested in acquiring

flesh-sensing safety technology for table saws.  (<u>See</u> PF ¶¶ 1-4).  It is undisputed that at some

point during the 2003 to 2006 time frame, Butler had hired a law firm to explore whether he

could license such technology from a company known as SawStop, or design around SawStop's

patents.  (<u>See</u> PF ¶ 2).  However, Balolia's attempt to obtain a license from SawStop proved

unsuccessful.  (PF ¶ 4).  Furthermore, because SawStop owned about 80 different patents,

Balolia concluded that any effort to design a non-infringing, flesh-sensing product would likely

not be possible.  (PF ¶ 3).

<b><u>Initial Communications Between the Parties</u></b>

In January 2010, Butler sent letters to manufacturers of table saws and woodworking

machinery, including Balolia, in which he expressed his desire to license or assign the rights to

the Whirlwind technology.   (DF ¶ 6).  Balolia responded that he was interested in obtaining

more information about Butler's technology, and that he would be willing to discuss licensing as

long as the Whirlwind technology was patented.  (Def. Ex. 3 at SB0000462).  The parties then

proceeded to engage in communications regarding the potential purchase and sale of Butler's

technology.  (DF ¶ 7).  In March 2011, Butler informed Balolia that he had retained Robert

Calhoun ("Calhoun") as his business advisor to communicate and handle negotiations on his behalf. (DF ¶ 8).

In October 2011, Butler distributed another communication to manufacturers of table saws and woodworking machinery, including the defendant, seeking formal proposals for the acquisition of the Whirlwind technology. (PF ¶ 12; Pl. Ex. 3). The communication invited interested parties to an Informational Meeting that would be held "to give potential partners or patent owners the opportunity to ask questions and view demonstrations of the prototype Whirlwind equipment." (Pl. Ex. 3 at SB0000339). It also included a section, entitled "Our Objectives," in which the plaintiff stated as follows:

> What is unique about this negotiation is that we, the sellers, are emphasizing short-term monetization rather than ... the more generally expected long-term licensing gains attributed to this type of intellectual property transaction. While we recognize that this objective may introduce increased risk for a potential buyer or buyers, in order to balance the buyer's risk we are prepared to accept an appropriate price and terms which reflect the buyer's position, risk and plans.

(Id. at SB0000339-340). There is no dispute that Balolia received this document, and was aware of Butler's objectives. (PF ¶ 12).

Subsequently, Calhoun met with Balolia at Grizzy Industrial's facility in Washington and provided the defendant with information regarding the Whirlwind technology. (PF ¶ 8; Pl. Ex. 1 at 63). At some point during the meeting, Calhoun asked Balolia if he intended to attend Butler's Informational Meeting. (Pl. Ex. 4 at 40). The defendant replied that he did not need to attend the meeting because he understood the Whirlwind technology and how the technology operated. (PF ¶ 9).

By 2012, Balolia had become aware of legislation pending in the State of California, which would require flesh-sensing safety devices on table saws. (PF ¶ 6). He also had concerns about the fact that other state governments, as well as members of the federal government and various consumer safety groups, were pushing for similar legislation. (See PF ¶ 5). Balolia was unaware of any companies that had developed flesh-sensing safety technology for table saws other than Whirlwind and SawStop. (PF ¶ 11). Because his earlier attempt to acquire a license from SawStop had failed, it appears that Whirlwind remained Balolia's only option for obtaining rights to the technology.

At some point, the defendant learned that SawStop thought the Whirlwind technology might infringe upon its patents. (PF ¶ 10; Pl. Ex. 2). Nevertheless, he continued to communicate with Calhoun regarding a possible purchase of the plaintiff's product. (See DF ¶ 9; PR ¶ 9). The record establishes that Butler presented the defendant with an initial asking price of $3 million for the Whirlwind technology. (PF ¶ 13). However, after further email exchanges and telephone conferences between Balolia and Calhoun, including communications in which Balolia expressed concern about SawStop filing a lawsuit against him if he were to acquire the Whirlwind technology, the parties arrived at a purchase price of $2.1 million. (DF ¶ 9; PR ¶ 9; see also Pl. Ex. 4 at 60-61; Pl. Ex. 6). Calhoun made it clear that Butler would not be offering the defendant any type of indemnification that would protect Balolia in the event of an infringement action. (PF ¶ 16). Therefore, Balolia was aware, at the time of the parties' initial discussions, that there would be an infringement risk associated with the purchase of the Whirlwind technology.

**The LOI**

In April 2012, Butler and Balolia executed an LOI that had been prepared by Balolia's counsel. (DF ¶ 10; PF ¶¶ 19-20). The LOI is a typewritten document that is about two and a half pages in length. (Def. Ex. 1). It defines Balolia as the "Purchaser" and Butler as the "Seller." (Id.). On the first page of the document, the LOI provides that "[t]he Parties intend to negotiate and enter into a separate Purchase Agreement by June 20, 2012, for Purchaser's acquisition from Seller of the Whirlwind flesh sensing patents and technology[,]" and it lists various patents and technology to be included in the sale. (Id. ¶ 1). The next page of the document provides that "[t]he Parties will use their best efforts to negotiate and attempt to agree to terms for the Purchase Agreement." (Id. ¶ 2). Under the heading "Purchase Price," the LOI reads: "The purchase price for the assignment of the patents and other rights and assets will be Two Million One Hundred Thousand Dollars ($2,100,000) payable upon closing of the Purchase Agreement." (Id. ¶ 4).

As set forth in the LOI, the parties recognized that it might be necessary to exchange trade secrets and other confidential and proprietary information in connection with the nego-tiation of a Purchase Agreement, and they agreed that such information would be treated as confidential. (Id. ¶ 3). The LOI also contains an "exclusivity" provision pursuant to which Butler agreed that "[i]n consideration of the time and expense which [Balolia] has devoted and will devote to the transaction contemplated hereby," he would refrain from entering into negotia-tions or other communications with any other prospective purchasers until after the June 20, 2012 deadline for entering into the Purchase Agreement had passed. (Id. ¶ 5). Finally, the LOI contains a choice of law provision under which the parties agreed that the LOI would be

governed by Washington law.  (Id. ¶ 8).  As described below, Butler argues that the LOI

constitutes an enforceable contract for the purchase of Whirlwind technology at a price of $2.1

million.  Balolia, on the other hand, contends that the LOI was nothing more than an agreement

to use his best efforts to conduct negotiations in good faith, with the aim of reaching agree-

ment on the terms of a final Purchase Agreement, and that all of the provisions of the LOI,

including the purchase price, were subject to further negotiation by the parties.

### Events Following Execution of the LOI

On April 26, 2012, three days after the LOI was fully executed, Butler entered into a

Non-Disclosure/Confidentiality Agreement with the defendant's company, Grizzly Industrial.

(DF ¶ 17; Def. Ex. 4).  Therein, Butler agreed, among other things, that he "will not disclose to

any person the fact that Butler is in discussions with and that negotiations are taking place

concerning a possible transaction between Grizzly and Butler."  (DF ¶ 17; Def. Ex. 4 ¶ 4).  On

that same day, Grizzly Industrial retained Jeffrey Salmon ("Salmon"), an attorney at the law firm

of Freeborn & Peters LLP, to represent it with respect to the matter.  (DF ¶ 18; PR 18; PF ¶ 21).

Salmon is a patent attorney who has been in private practice since 1992, and holds both a law

degree from Indiana University and a degree in electrical engineering from Northwestern

University.  (DF ¶¶ 19-21).  According to Balolia, Grizzly did not want to hire Salmon and begin

incurring the costs necessary to have him review the relevant patents until the LOI and the

Non-Disclosure Agreement had been executed.  (DF ¶ 22; PR ¶ 22).  As described below, much

of Salmon's work on the matter appears to have been directed at assessing the risk that

SawStop would sue Balolia for patent infringement if the defendant were to purchase and

develop the Whirlwind flesh-sensing technology.  In fact, it is undisputed that Freeborn &

Peters referred to their work on behalf of Grizzly Industrial as the "Saw Stop Patent Investigation" matter. (PF ¶ 22).

For the time period from April 27, 2012 through May 21, 2012, Salmon billed Balolia for over 100 hours of work, and charged him more than $50,000 in fees. (See DF ¶¶ 23-24; Def. Ex. 5 at B0000862-871). According to Balolia, all of the work that Salmon and members of his firm performed on behalf of Grizzly Industrial related to "due diligence and negotiations under the LOI." (DF ¶¶ 23-24). For his part, Butler denies that Salmon engaged in any negotiations, as called for under the terms of the LOI. (PR ¶¶ 23-24). Rather, Butler contends that all of Salmon's efforts were aimed at reducing the purchase price to which the parties had already agreed, and undermining the deal that had previously been reached. (See id.; Pl. Ex. 4 at 99-101; Pl. Ex. 8 at 45; Pl. Ex. 10; Pl. Ex. 12).

The record establishes that as part of his work on the SawStop Patent Investigation, Salmon corresponded and attended meetings with Butler, Calhoun and Butler's patent attorney, Milton Oliver. (See Def. Ex. 5 at B0000865-868). He also spent over 40 hours analyzing the SawStop patents and SawStop prior art. (PF ¶ 23). The record further demonstrates that other members of Salmon's firm who were working on the case spent over 20 hours attending to matters relating to the table saw safety legislation that was pending in California. (PF ¶ 24). Balolia has not explained how the latter work related to his promise to negotiate a Purchase Agreement with the plaintiff.

At Balolia's request, Salmon contacted SawStop directly to inquire whether it intended to initiate infringement litigation if the Whirlwind technology were brought to market. (PF ¶ 25). However, SawStop provided no guidance on the issue. Instead, it declined to take a

position, prior to the Whirlwind technology coming to market, as to whether it believed Whirlwind would infringe upon its patents. (See PF ¶ 26).

During his communications with Butler's representatives, Salmon expressed concerns about a number of serious legal issues regarding the Whirlwind technology. (DF ¶ 25; PR ¶ 25; Def. Ex. 6 at 48-49). Those concerns included design around risks, validity risks and infringement risks that Balolia might face if he were to manufacture and sell products with the technology disclosed in Butler's patent. (Def. Ex. 6 at 49). He also expressed skepticism about the value of Butler's patent rights. (DF ¶ 31; PR ¶ 31).

Butler contends that Salmon's concerns were the same as those that Balolia had expressed when the parties were negotiating the purchase price for the technology, and the same concerns that had led him to agree to reduce the selling price from $3 million to $2.1 million, as set forth in the LOI. (PR ¶ 25). Butler further contends that Salmon's concerns were nothing more than a pretext for changing the price that had been agreed to by the parties. (Id.). In support of his position, Butler has presented evidence demonstrating that from the beginning of his involvement in the parties' discussions, Salmon attempted to reduce the price that Butler would accept from the defendant. (See PF ¶ 27). He has also presented evidence showing that Salmon remained persistent in his efforts to reduce the purchase price even though Butler made it clear that the $2.1 million remained non-negotiable. (See PF ¶¶ 28-33, 40, 43).

On May 7, 2012, Salmon traveled to Massachusetts to meet with Butler, Calhoun, and Butler's patent counsel, Oliver. (See DF ¶ 27; PR ¶ 27; PF ¶ 31). During the visit, Calhoun picked Salmon up from his hotel to take him to dinner with Butler and Oliver. (PF ¶ 31). When

Salmon got into the car, he immediately told Calhoun that Balolia would not be paying $2.1 million to purchase Whirlwind's assets. (Id.). Calhoun's response was to tell Salmon that there was no reason to go to dinner, and that he would turn the car around and take Salmon back to his hotel. (PF ¶ 32). Salmon then backed off and the dinner meeting went forward. (See PF ¶¶ 33-34). Nevertheless, Butler believed that Salmon's purpose in visiting Massachusetts was to try to reduce the sale price set forth in the LOI. (See Pl. Ex. 9 at 32).

During the dinner, the parties discussed the Whirlwind technology as well as the SawStop technology, but they did not discuss the financial terms of the proposed purchase. (PF ¶¶ 34-35). Additionally, Salmon expressed some concern about the infringement risks associated with the Whirlwind technology. (PF ¶ 36). Oliver believed Salmon's concerns were "far-fetched" given the distinctions between the Whirlwind technology and the SawStop technology. (Id.; PR ¶ 31). He also believed that Salmon was trying to make patent-related arguments in order to diminish the value of Butler's portfolio and renegotiate the financial terms that previously had been reached. (PR ¶ 31; Pl. Ex. 8 at 52).

The parties met again the following morning so that Butler could show Salmon how the Whirlwind technology operated. (PF ¶ 37). During the meeting, Salmon again raised questions relating to the strength of the Whirlwind patent. (See PF ¶ 38). Butler maintains that Salmon had no interest in understanding the technology, and that his only goal was to renegotiate the purchase price of the technology. (PF ¶ 39; Pl. Ex. 9 at 32). Balolia disputes the plaintiff's characterization of Salmon's intentions, and argues that it is "an unsupported conclusion apparently drawn by Butler and his representatives." (DR ¶ 39).

On May 9, 2012, following his return from Massachusetts, Salmon sent an email to Butler, Calhoun and Oliver. (Def. Ex. 10). Therein, Salmon requested a USB memory stick containing "copies of all of Mr. Butler's invention development records, together with copies of all of the various patent applications he has filed and their prosecution histories." (Id.). He also described what he claimed to be "two potential design around risks with regard to Mr. Butler's technology." (Id.). Additionally, Salmon informed the plaintiff that

> [u]nless we can negotiate a new deal, with the end result being very similar financially for Mr. Butler, [Balolia] is giving some serious thought to whether he should move forward because of the above-referenced design around risks, as well as the other issues we discussed at our meeting regarding the Saw Stop patents. Please let me know at your earliest convenience if your side is interested in trying to negotiate a new deal the terms of which reflect these risks.

(Id.).

Salmon sent another email to Oliver a number of days later in which he reiterated Balolia's view that the financial terms of the LOI were no longer acceptable. (See Pl. Ex. 17 at SB0000158-159). As Salmon stated in relevant part:

> I suggest that the most expeditious way to proceed in this matter is for Mr. Butler to indicate his agreement that the financial terms stated in the letter of intent are not realistic in view of the design around risks I have shared with you. Without a firm indication from Mr. Butler that he is willing to talk about financial terms that appropriately share risk between the parties, then I have instructions from my client to no longer spend any time on the potential transaction. Please consider this with your client and let me know his response.

(Id.). Salmon went on to emphasize that, "if all goes well with the potential contingencies we have in mind, then the financial end result of that will be the same as the old deal." (Id.).

Butler responded to Salmon's correspondence in two emails dated May 17, 2012. (See Def. Ex. 11; Pl. Ex. 17 at SB0000155-157). In his first email, Butler addressed Salmon's specific

concerns regarding the design around risks of the Whirlwind technology. (Pl. Ex. 17 at SB0000155-157). After explaining why in his view Salmon's concerns were unfounded, Butler emphasized, "we do not have any reason for design around concerns on any of these issues." (Id. at SB0000157). Nevertheless, he urged Salmon to raise any further patent or design around concerns as soon as possible so they could be addressed. (Id.). In his second email, Butler addressed Salmon's concerns regarding the SawStop patents, and explained why he did not believe they posed any problems for the Whirlwind technology. (Def. Ex. 11). Although Butler indicated that he understood and respected the defendant's "need for due diligence," he also expressed frustration with Balolia's positions. (See id. at SB0000161). Because he was concerned that Balolia was not interested in negotiating a purchase agreement consistent with the terms of the LOI, Butler did not immediately provide Salmon with a USB memory stick containing the confidential information that Salmon had requested. (PF ¶ 42).

Salmon replied to Butler's correspondence in an email to Oliver dated May 17, 2012. (Pl. Ex. 11). Salmon first asked Oliver whether the plaintiff would accept "a much smaller up front payment with financial contingencies" based on his future success in getting notices of allowances from the U.S. Patent and Trademark Office, and obtaining reexaminations that would reduce litigation risk. (Id.). In addition, Salmon indicated that Butler had misunderstood one of the design around issues, and he asked for a response from Oliver on that issue. (Id.).

Within minutes after Salmon sent his email to Oliver, Butler sent Salmon an email criticizing Salmon's statements. (See Pl. Ex. 12). As Butler stated in significant part:

> First, my emails are fully responsive to the baseless objections or risks associated with my Whirlwind IP portfolio which you have raised. We have a Letter of Intent on place which clearly defines our agreed upon price and terms. When you contacted my counsel initially it was without notice and

> intended to change the price and terms even though you did not understand
> the technology and the risks involved. Therefore without much more
> complete and substantive evidence of your alleged risks we will not change
> the price and terms of our Letter of Intent. I have been studying these issues
> for more than seven years. I am fully aware of the [SawStop] patent
> portfolio. I have a very thorough understanding of the engineering involved
> and why we stand fully apart from the [SawStop] technological innovations
> and can debate all these topics with experts of your choice….

(Id.).  Butler also objected to Salmon's suggestion that he had misunderstood one of Salmon's

design around concerns, and he attempted to explain again why Salmon's concerns had "no

merit[.]"  (Id.)

The parties' next communication took place on May 21, 2012, when Salmon sent an

email to Oliver in which he attached a letter that had been written by Balolia.  (Def. Ex. 12).  In

his email, Salmon indicated that he and Balolia were not satisfied with Butler's responses to

their concerns about Butler's patent portfolio, and that they "would like to have your patent

transactional counsel specifically address our concerns about the design around and litigation

risks in writing."  (Id. at SB0000806).  Moreover, Salmon argued that the LOI was voidable for

mutual mistake because "both sides were mutually mistaken about the breadth of Mr. Butler's

technology when the letter of intent was negotiated[,]" and he stated that Balolia would never

have agreed to the price contained in the LOI if he had known about the design around and

litigation risks when he negotiated that document.  (Id.).  Nevertheless, Salmon informed Oliver

that the defendant remained willing to purchase the Whirlwind technology pursuant to the

financial terms described in the attached letter, and that Balolia would walk away if Butler

would not accept them.  (Id.).  As described in Balolia's letter, the defendant was willing to pay

the plaintiff $300,000 when a Purchase Agreement was signed, and to make additional

payments totaling $1.6 million, which would be paid in installments as certain contingencies

were met.  (Id. at SB0000808-09).  These terms, which Salmon described as Balolia's "bottom line offer," were inconsistent with the LOI, which called for $2.1 million to be paid upon closing of the Purchase Agreement.  (See id. at SB0000806; Def. Ex. 1 ¶ 4).

On May 29, 2012, Butler's litigation counsel, Michael Lambert ("Lambert"), notified Salmon that Butler had filed a breach of contract action against Balolia in Suffolk Superior Court.  (PF ¶ 55; DR ¶ 55).  In his letter to Salmon, Lambert stated that the plaintiff rejected Balolia's effort to rescind the LOI based on mutual mistake, and argued that any mistake was the defendant's mistake alone, and was not related to a material fact, "but is instead your client's judgment relating to perceived risks with the Whirlwind intellectual property."  (Def. Ex. 13 at B0000897).  Additionally, Butler's counsel argued that Balolia was aware of these risks at the time he executed the LOI.  (Id. at B0000898).  As Lambert stated in relevant part:

> it is undisputed that your client contemplated the "design around" and litigation risks regarding the Whirlwind technology prior to executing the LOI. Indeed, this was the basis for the reduction in price for the technology from $3 million to $2.1 million.  Moreover, your client clearly bore the risk of any "mistake" regarding these issues.  Your client had access to the patents prior to signing the LOI, yet treated this limited knowledge as sufficient prior to entering into the contract.

(Id. at B0000898).  Balolia later removed the case to this court on the basis of diversity jurisdiction.  (See Docket No. 1).

**Events Following Filing of the Lawsuit**

Despite his decision to initiate litigation against Balolia, Butler remained interested in negotiating a final Purchase Agreement.  (See Def. Ex. 13 at B0000898).  Similarly, Balolia informed Butler that he "remain[ed] willing to negotiate under the LOI[,]" and requested that Butler respond to his latest proposal regarding payment terms.  (Def. Ex. 15).  On June 1, 2012,

Butler responded by confirming that he was "ready and willing to negotiate a Purchase Agreement consistent with the terms we agreed to in the LOI[,]" but that he was "not willing to completely restructure the deal" that had been reached, and was rejecting Balolia's proposal. (Id.).  He also requested that the defendant agree to waive the exclusivity provisions of the LOI so that he could respond to inquiries from other parties regarding the Whirlwind technology. (Id.).

The parties continued to communicate throughout the first few weeks of June 2012. Thus, on June 1, 2012, Balolia told Butler that he appreciated the plaintiff's unwillingness "to completely restructure the proposed terms that we initially discussed[,]" but that it would be helpful if Butler would make a counterproposal to the defendant's May 21, 2012 proposal. (Def. Ex. 16).  Additionally, Balolia informed Butler that he would not waive the exclusivity provision of the LOI, but that he would be willing to change the expiration date of the exclusivity requirement to June 1, 2012 if Butler would agree to give Balolia an option to match any offer that he might receive from other parties.  (Id.).  In a reply email dated June 4, 2012, Butler confirmed both his willingness to negotiate a Purchase Agreement, and his view that Balolia's May 21, 2012 proposal was "completely inconsistent with [the defendant's] obligations" under the LOI.  (Def. Ex. 17).  Although Butler declined to offer Balolia a right of first refusal, he stated that he would "continue to try to work with you to complete the transaction set forth in the binding letter of intent[.]"  (Id.).

Balolia wrote to Butler again two days later.  (Id.).  In his communication, Balolia confirmed that he too "remain[ed] willing to continue to negotiate under the LOI."  (Id.).

However, he also noted that the LOI did not require either of the parties to enter into a purchase agreement.  (Id.).  In particular, Balolia emphasized that

> [i]f the parties cannot agree to terms for the purchase agreement, then neither party is bound to enter into a purchase agreement.  The exclusivity provision of paragraph 5 of the LOI further demonstrates that the parties have not yet agreed to final terms.  After June 20, 2012, you are free to solicit other offers and negotiate an agreement with any other person.

(Id.).  Balolia went on to explain that he had not been able to complete his due diligence because he had never received certain information that Salmon had requested from Butler, and that in the absence of the information, he was "not in a position to evaluate whether or not the proposed terms are acceptable to me or to negotiate what terms would be acceptable."  (Id.).

Subsequently, Balolia had a telephone conversation with Calhoun in which the parties discussed their interest in reaching a deal and Calhoun promised to provide Balolia with additional information regarding the Whirlwind technology.  (PF ¶ 62; Pl. Ex. 1 at 179-81).  As a result of the conversation, Balolia understood that he would be receiving all of the information he had requested from the plaintiff.  (Pl. Ex. 1 at 181).  He also understood that if everything worked out and negotiations went favorably, the parties would complete the deal described in the LOI.  (Id. at 181-82).

On June 8, 2012, Butler sent Balolia an email in which he stated, "I'm happy to learn that you and [Calhoun] had a productive discussion today and that we are back on track."  (Def. Ex. 19).  Butler also promised to "cooperate . . . fully in all disclosures[,]" and to provide the defendant with all of the available patent information and documentation.  (Id.).  Additionally, Butler attached a draft Purchase Agreement for Balolia's consideration.  (Id.).  The draft

Purchase Agreement, which Balolia forwarded to his lawyer, included a purchase price of $2.1 million.  (DF ¶ 48; PR ¶ 48; PF ¶ 69).

Shortly thereafter, Butler provided Balolia with a copy of his patent application and a thumb-drive containing voluminous technical details concerning the Whirlwind technology.  (PF ¶ 66).  On June 18, 2012, Balolia informed the plaintiff that he was reviewing the material, and that it would take a while to complete the review.  (Def. Ex. 20).  He also told Butler, "I am still awaiting your formal response to my last proposal.  While I understand it is not acceptable to you, I would like to have your thoughts on what would be."  (Id.).  Thus, Balolia did not view Butler's draft Purchase Agreement as a response to the terms he had proposed on May 21, 2012.  (See PF ¶ 71; DR ¶ 71).

On June 19, 2012, Butler sent Balolia another email.  (Pl. Ex. 14).  Therein, Butler again expressed his view that the Purchase Agreement should reflect the financial terms set forth in the LOI.  Specifically, as Butler stated in his email:

> As you also know, we prepared and sent you a Purchase Agreement on June 8th.  The Purchase Agreement reflects what the parties agreed to do under the LOI, what was acceptable to me at the time we signed the LOI and what remains acceptable to me.  Since you have had the Purchase Agreement for a while and have had ample time to review it, but you have not commented on the Purchase Agreement, I trust that it is also acceptable to you (assuming that you decide to abide by the LOI and the price agreed to in the LOI).  As I have made clear to you several times in the past few weeks, I am not interested in discussing any other proposals other than the one in the binding LOI.

(Id.).  Butler further proposed that the deadline for signing the Purchase Agreement be extended for two days to June 22, 2012.  (Id.).

Balolia responded to Butler's email on June 20, 2012, the deadline set forth in the LOI for the parties to execute a Purchase Agreement.  (PF ¶ 74).  The defendant expressly informed

Butler that the draft Purchase Agreement was "NOT acceptable[.]" (Id.). He also explained that the thumb drive Butler had sent him was "missing emails and documents during the important early period of [the] patent[,]" and that as a result, he was not able to complete his due diligence. (Def. Ex. 21 at SB0000244). Finally, Balolia stated:

> the due diligence I have completed to date has raised many issues regarding the value of your patent and technology and, based on these issues, the initial proposed terms of the LOI are not acceptable. Accordingly, I see no need to extend the deadlines in the LOI unless you are interested in discussing other proposals.

(Id.). Although Butler wrote back immediately to ask the defendant to identify what documents and email he had determined were missing, and to explain how that information could possibly "change the price on which we already agreed[,]" Balolia did not respond to the plaintiff's inquiry. (PF ¶¶ 79-80). Accordingly, the deadline for the parties to negotiate and enter into a separate Purchase Agreement expired, and no such agreement was ever executed.

### The Instant Litigation

On August 3, 2012, Balolia filed a motion to dismiss the plaintiff's complaint. (Docket No. 12). Butler opposed the motion, and filed his own motion for leave to amend the complaint. (Docket Nos. 17-18). The District Judge who was then assigned to the case allowed the motion to dismiss.[4] Butler v. Balolia, Civil Action No. 12-11054-JLT, 2013 WL 752363, at *2 (D. Mass. Feb. 26, 2013), vacated, 736 F.3d 609 (1st Cir. 2013). Applying Washington law, the District Judge found that the LOI was an agreement to agree because it contemplated a future

---

[4] This case was originally assigned to Judge Tauro, who granted Balolia's motion to dismiss, and was then reassigned to Judge Wolf. In accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties have since consented to reassignment of the case to Judge Dein.

purchase agreement following additional negotiations.  Id.  He also found that such agreements are unenforceable as contracts under Washington law.  Id.  Because all of Butler's claims depended upon the existence of an enforceable contract, the District Judge concluded that all those claims must fail, and that Balolia could not be held liable under any legal theory.  Id.  In the same order, the District Judge denied the plaintiff's motion to amend on the grounds of futility.  Id.

Butler appealed the dismissal to the First Circuit Court of Appeals.  See Butler v. Balolia, 736 F.3d 609 (1st Cir. 2013).  The First Circuit agreed with the District Judge that Washington law was controlling based on the choice of law provision contained in the LOI.  Id. at 612.  It also found that "[t]he district court's determination that the LOI cannot be construed as a binding contract for sale" was "unarguable[,]" and that "the LOI plainly is not a binding agreement to purchase[.]"  Id. at 612, 617.  However, the First Circuit determined that the District Court had erred by failing to consider whether the LOI constituted an enforceable contract to negotiate, even though the Washington Supreme Court has never decided whether agreements to negotiate are enforceable under Washington law.  Id. at 612-13.  Because the Court went on to predict that "the Washington Supreme Court will in all probability recognize the enforceability of contracts to negotiate when it squarely confronts that issue[,]" and to find that Butler's complaint stated a plausible claim for breach of a contract to negotiate, it vacated the District Judge's decision and remanded the matter to this court for further proceedings.  Id. at 616, 618.

The complaint has since been amended on two separate occasions, and certain of Butler's claims have been dismissed.  The remaining claims, which are set forth in the plaintiff's Second Amended Complaint, consist of claims for declaratory judgment (Count I), breach of

contract (Count II) and breach of the implied covenant of good faith and fair dealing (Count III).

By his claims, Butler is seeking a declaration that the LOI is a binding and enforceable contract

to purchase Whirlwind, and that the defendant breached its contractual obligations by failing to

purchase the technology or to negotiate in good faith toward the execution of a purchase

agreement.

### III. ANALYSIS

#### A. Summary Judgment Standard of Review

Balolia has moved for summary judgment, pursuant to Fed. R. Civ. P. 56, with respect to

all of Butler's claims.  "The role of summary judgment is 'to pierce the pleadings and to assess

the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci

Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950

F.2d 816, 822 (1st Cir. 1991)) (additional citations omitted).  The burden is upon the moving

party to show, based upon the discovery and disclosure materials on file, and any affidavits,

"that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be

resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)

(quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it

possesses the capacity to sway the outcome of the litigation under the applicable law."  Id.

(quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving

party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd.,

794 F. Supp. 2d at 275.  The opposing party can avoid summary judgment only by providing

properly supported evidence of disputed material facts.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  "The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  "Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."  Id.

**B.      Count I: Claim for Declaratory Judgment**

In Count I of his Second Amended Complaint, Butler is seeking a declaration that the LOI constitutes a binding and enforceable contract for the purchase of the Whirlwind technology.[5] The defendant argues that this claim has been foreclosed by the decision of the First Circuit, which constitutes the law of the case, and that the undisputed facts further establish that the LOI is not a purchase agreement.  (Def. Mem. (Docket No. 115) at 7; Def. Reply Mem. (Docket No. 130) at 1-5).  This court agrees that the First Circuit's decision, as well as the plain language of the LOI itself, defeat Butler's theory that a purchase agreement was consummated.

---

[5] As the First Circuit stated in its decision on appeal, "the plaintiff's complaint is not a model of clarity." Butler, 736 F.3d at 616.  Although Count I of the Second Amended Complaint alleges that the LOI is a binding and enforceable contract, "it is less than pellucid as to whether that contract is thought to be a final contract of sale or a contract to negotiate.  The allegations can be read either way[.]" Id.  However, in his opposition to Belolia's motion for summary judgment, Butler has clarified that Count I "seeks a declaration that the LOI is a binding and enforceable contract to purchase Whirlwind."  (Pl. Opp. Mem. (Docket No. 122) at 7).

**The Law of the Case**

"Under the law of the case doctrine, 'when a court decides upon a rule of law, that

decision should continue to govern the same issues in subsequent stages in the same case.'"

Negron-Almeda v. Santiago, 579 F.3d 45, 50 (1st Cir. 2009) (quoting United States v. Wallace,

573 F.3d 82, 87-88 (1st Cir. 2009)).  The doctrine has two branches.  Id.  The first branch, which

is applicable here, is known as the "mandate rule."  Id. (additional quotations omitted).  It

"prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an

earlier appellate decision in the same case."  Id. (quoting United States v. Moran, 393 F.3d 1, 7

(1st Cir. 2004)).  The second branch "provides that 'unless corrected by an appellate tribunal, a

legal decision made at one stage of a civil or criminal case constitutes the law of the case

throughout the pendency of the litigation.'"  Ellis v. United States, 313 F.3d 636, 646 (1st Cir.

2002) (quoting Flibotte v. Pa. Truck Lines, Inc., 131 F.3d 21, 25 (1st Cir. 1997)).

In the instant case, the First Circuit determined that the LOI "plainly is not a binding

agreement to purchase[.]"  Butler, 736 F.3d at 617.  It also described as "unarguable" the

district court's decision that "the LOI cannot be construed as a binding contract of sale[.]"  Id. at

612.  Thus, the law of the case precludes a contrary finding with respect to Count I of the

plaintiff's complaint.

Butler attempts to avoid this result by characterizing the First Circuit's ruling on this

issue as non-binding dicta.  (Pl. Opp. Mem. (Docket No. 122) at 8-10).  As a general matter,

"[t]he law of the case doctrine does not apply to dicta."  Bull HN Info. Sys., Inc. v. Hutson, 229

F.3d 321, 326 n.3 (1st Cir. 2000).  In this case, however, Butler presented two issues to the First

Circuit for resolution on appeal:

1.  Whether, under Washington state law, David Butler properly pled in his Complaint that the Letter of Intent between the parties, in which there was a mutual meeting of the minds with respect to material terms including price and assets, is an enforceable contract for the sale of certain technology?

2.  Whether, under Washington state law, David Butler properly pled in his Complaint that the Letter of Intent between the parties was a 'contract to negotiate,' where the parties had agreed to the conditions that would govern their negotiation of a subsequent Purchase Agreement?

See Brief of Appellant David Butler dated 06/03/2013 in Butler v. Balolia, Court of Appeals Docket No. 13-1329.  Thus, the question whether the LOI constitutes an enforceable contract for the purchase and sale of the Whirlwind technology was squarely before the First Circuit.  Under such circumstances, the Court's determination that the LOI cannot be construed as a binding contract for the sale of the technology should not be open to reconsideration by this court.  See Ellis, 313 F.3d at 646 (explaining that law of the case "forbids, among other things, a lower court from relitigating issues that were decided by a higher court, whether explicitly or by reasonable implication, at an earlier stage of the same case").

## Nature of the Parties' Agreement

Even if the law of the case were inapplicable, and the parties were free to relitigate the question whether the LOI constituted an enforceable contract for the purchase and sale of the Whirlwind technology, this court would find in favor of Balolia on this issue.  "Washington follows the objective manifestation test for contracts."  Keystone Land & Dev. Co. v. Xerox Corp., 152 Wash. 2d 171, 177, 94 P.3d 945, 949 (2004).  Consequently, in order to form a contract, "the parties must objectively manifest their mutual assent."  Id.  In addition, the agreed upon terms "must be sufficiently definite" to enable a court to fix the parties' legal

liability, and "the contract must be supported by consideration[.]"  Id. at 178, 94 P.3d at 949.

In the case of the LOI, the parties expressed a mutual assent "to negotiate and enter into a

*separate* Purchase Agreement" for Balolia's purchase of the Whirlwind technology, and to "use

their best efforts to negotiate and *attempt* to agree to terms for the Purchase Agreement."

(Def. Ex. 1 ¶¶ 1-2 (emphasis added)).  Nothing in the LOI indicates that the parties intended to

remain bound to carry out a sale if they were unable to negotiate the terms of a final Purchase

Agreement.  Compare Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491,

499-500 (S.D.N.Y. 1987) (finding that parties manifested intent to be bound by the terms of

their preliminary agreement where "[t]he exchange of letters constituting the commitment was

replete with the terminology of binding contract" and "[t]he intention to create mutually

binding contractual obligations [was] stated with unmistakable clarity").[6]

"There is a strong presumption against finding binding obligation in agreements which

include open terms, call for future approvals and expressly anticipate future preparation and

execution of contract documents."  Id. at 499.  Because the LOI expressly contemplates a

separate contract, and contains no language indicative of "a 'firm commitment' or 'binding

agreement'" with respect to the purchase of the Whirlwind technology, it cannot be construed

as a binding contract for sale.  See id. (a party not wishing to be bound by a preliminary

agreement "can very easily protect itself by not accepting language that indicates a firm

---

[6] Teachers has been used as "the template" by which state and federal courts throughout the country have "assess[ed] whether certain elements of a preliminary agreement have binding effect" on the parties thereto.  West Palm Beach Hotel, LLC v. Atlanta Underground, LLC, 626 Fed. Appx. 37, 41 (3d Cir. 2015).

commitment' or 'binding agreement.'").  For this reason as well, Balolia is entitled to summary judgment on Count I of the Second Amended Complaint.

### C.      Count II: Claim for Breach of Contract

In Count II, Butler is seeking to hold Balolia liable for breach of the LOI.  The First Circuit has construed this claim as a claim for breach of a binding contract to negotiate.  See Butler, 736 F.3d at 617-18.   Balolia argues that summary judgment is warranted with respect to Count II because no reasonable jury could conclude that he failed to negotiate with Butler in good faith and that he breached his obligations under the LOI.  (Def. Mem. at 13-16).  For the reasons that follow, this court concludes that the question whether Butler breached a contractual duty to negotiate is best resolved by a jury at trial.

### Scope of Balolia's Duty to Negotiate

Under a contract to negotiate, such as the LOI in this case, "the parties exchange promises to conform to a specific course of conduct during negotiations, such as negotiating in good faith, exclusively with each other, or for a specific period of time."  Keystone Land & Dev. Co., 152 Wash. 2d at 176, 94 P.3d at 948.  While "no breach occurs if the parties fail to reach agreement on the substantive deal[,] [t]he contract to negotiate is breached . . . when one party fails to conform to the specific course of conduct agreed upon."  Id.  Here, as described above, the parties agreed to "use their best efforts to negotiate and attempt to agree to terms for the Purchase Agreement" for Balolia's acquisition of the Whirlwind technology from Butler. (Def. Ex. 1 ¶ 2).  Accordingly, in order to hold the defendant liable for breach of contract, Butler must establish that Balolia failed to use his best efforts to negotiate a Purchase Agreement.

The phrase "best efforts" is not defined in the LOI. (See Def. Ex. 1). Nor has either party presented evidence to show what they intended by this language. Balolia argues, and Butler does not dispute, that in the absence of clear standards as to what is meant by "best efforts," the parties were merely obligated to negotiate in good faith. (See Def. Mem. at 10-13; Pl. Opp. Mem. at 13-14). This is consistent with available case law involving agreements to negotiate. See, e.g., L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 423, 430 (2d Cir. 2011) ("L-7 Designs I") (ruling that preliminary agreement, under which the parties agreed that terms and conditions of a new clothing line were "to be negotiated and agreed upon by the parties in a separate agreement[,]" obligated the parties "to negotiate together in good faith in an effort to reach final agreement" (quotations and citation omitted)); Denil v. DeBoer, Inc., 650 F.3d 635, 638 (7th Cir. 2011) (finding that neither party violated its obligation to use its "'best efforts' to reach agreement on a buy-sell contract" where both sides engaged in "good-faith bargaining toward a contract" even though no contract was ever executed). See also Butler, 736 F.3d at 617 (citing cases applying good faith standard to contract negotiations in order to support conclusion that Butler stated a plausible claim for breach of contract to negotiate). Therefore, this court finds that the appropriate question for purposes of Butler's breach of contract claim is whether Balolia breached his obligation to negotiate in good faith toward the formation of a Purchase Agreement.

### Parameters of "Good Faith" Negotiations

"In the context of the obligation to negotiate in good faith pursuant to a preliminary binding agreement, the parameters of what constitutes good faith, or bad faith, are not clearly delineated." L-7 Designs, Inc. v. Old Navy, LLC, 964 F. Supp. 2d 299, 307 (S.D.N.Y. 2013) ("L-7

Designs II").  However, certain guidelines have emerged from the available case law.  As an initial matter, courts addressing agreements to negotiate in good faith appear to draw no distinction between a lack of good faith and acting in bad faith.  See West Palm Beach Hotel, LLC v. Atlanta Underground, LLC, 626 Fed. Appx. 37, 42-43 (3d Cir. 2015) (equating lack of good faith with bad faith for purposes of determining whether defendant breached an agreement to negotiate in good faith); Venture Assocs. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275, 279-80 (7th Cir. 1996) (same).  Even if such a distinction did exist, this court finds that the facts of this case would not require the distinction to be made at this stage in the litigation.

Courts also appear to agree that "at the very least, good faith requires 'honesty in fact.'" L-7 Designs II, 964 F. Supp. 2d at 307 (quoting 6 Arthur Linton Corbin, On Contracts § 26.8 (rev. ed. 1993)).  See also Denil, 650 F.3d at 639 ("'Good faith' in contract law means honesty plus refraining from opportunistic conduct that exploits the other side's sunk costs").  "Negotiations conducted in good faith encompass an honest articulation of interests, positions, or under-standings."  L-7 Designs II, 964 F. Supp. 2d at 307 (quotations, citations and punctuation omitted).

Another guideline that has emerged from the case law is that "the duty to negotiate in good faith obligates a party only to *try* to reach an agreement[.]"  Id.  While good faith in negotiations "requires an exchange of proposals and obliges each side to consider the other's requests seriously, and to compromise when possible, . . . it does not compel either side to accept the other's proposals."  Denil, 650 F.3d at 638.  The fact that a "disagreement . . . could not be bridged does not imply that either side failed to bargain in good faith."  Id.  See also L-7

Designs II, 964 F. Supp. 2d at 307 ("a party does not act in bad faith merely because, in the end, it refuses to capitulate to the other side's demands").

Next, courts have consistently held that in the context of an agreement to negotiate "[s]elf-interest is not bad faith."  L-7 Designs II, 964 F. Supp. 2d at 307 (quoting Venture Assocs., 96 F.3d at 279).  Consequently, there is nothing preventing a party from taking full advantage of its rights under a contract.  See Denil, 650 F.3d at 639 (defendant was entitled to take "full advantage of its rights under the contracts" as long as it did not attempt to exploit the other side's sunken transaction costs).  Nor is there anything preventing a party from acting in accordance with its own financial interests in response to legitimate market changes, as long as the party is not using those interests as a pretext for undermining the deal or exploiting the other party's sunken transaction costs.[7]  See West Palm Beach Hotel, 626 Fed. Appx. at 42-43 (finding that seller's decision to demand a higher sale price shortly before formal contract was scheduled to be signed did not constitute bad faith where undisputed evidence showed that market value of property increased during course of negotiations and seller was not engaged in "an impermissible effort to exploit [the purchaser's] sunk transaction costs"); Venture Assocs., 96 F.3d at 279 (defendant "was free to demand as high a price as it thought the market would bear, provided that it was not trying to scuttle the deal, or to take advantage of costs sunk by [the plaintiff] in the negotiating process" (internal citation omitted)).

---

[7] Balolia asserts that "the duty to negotiate in 'good faith' merely means the duty to negotiate according to one's own business interests."  (Def. Mem. at 10).  However, this is inconsistent with the standard articulated in the case law.  Although courts have found that self-interest in negotiation does not amount to bad faith, they do not define "good faith" as a duty to act in one's own interest.  As described herein, good faith in negotiation requires parties to act honestly, take steps to try to reach agreement and refrain from engaging in deliberate misconduct.

Finally, the cases establish that in order to constitute a failure to act in good faith, a party must engage in some "'deliberate misconduct[.]" Venture Assocs., 96 F.3d at 279. "For example, a party acts in bad faith if it 'renounces the deal, abandons the negotiations, or insists on conditions that do not conform to the preliminary agreement.'" L-7 Designs II, 964 F. Supp. 2d at 308 (quoting L-7 Designs I, 647 F.3d at 430) (quotations, citation and punctuation omitted). See also EQT Infrastructure Ltd. v. Smith, 861 F. Supp. 2d 220, 231 (S.D.N.Y. 2012) (allegations that defendants insisted on condition that was inconsistent with the parties' preliminary agreement concerning the terms of a sale stated a claim for breach of obligation to negotiate in good faith); Teachers, 670 F. Supp. at 505 (describing a party's "refus[al] to negotiate" as inconsistent with good faith negotiations). Similarly, "'trying to scuttle the deal' or to take advantage of expenditures made by the other side to advance the project may constitute bad faith, depending on the circumstances." L-7 Designs II, 964 F. Supp. 2d at 308 (quoting Venture Assocs., 96 F.3d at 279-80). As described above, however, no bad faith can be found "[w]here negotiations fail for bona fide business reasons[.]" Id.

**Whether Balolia Acted in Good Faith**

This court finds that the question whether Balolia breached his obligations under the LOI cannot be resolved on summary judgment because a jury viewing the evidence in the light most favorable to the plaintiff could reasonably conclude that Balolia did not act in good faith. Thus, the plaintiff has presented evidence which, if accepted as true, is sufficient to show that at the time the parties executed the LOI, Balolia was familiar with the Whirlwind technology, as well as with the infringement risks and design around concerns that accompanied the tech-nology, but that his reservations about purchasing the technology were overridden by his

desire to obtain rights to that technology before California enacted legislation requiring flesh-sensing safety devices on table saws and to prevent Butler from even negotiating with anyone else for at least a period of time. The record is also sufficient to show that because Balolia's earlier efforts to obtain licensing rights to the technology from SawStop were unsuccessful, his only viable option was to purchase Butler's technology. Moreover, a jury could reasonably find that at the time Balolia entered into the LOI with Butler, he understood that the $2.1 million purchase price was intended to reflect the risks associated with Balolia's purchase of the Whirlwind technology, and that Butler would not be willing to accept a lower price. Accordingly, a jury could reasonably infer that Balolia's insistence on a reduction in the sale price throughout the course of the parties' post-LOI communications was unreasonable, financially unfair, and motivated by a desire to scuttle the deal that the parties had anticipated when they entered into the LOI. See L-7 Designs I, 647 F.3d at 431 (proposing terms that party knows to be economically unfair, and believes will be rejected, supports claim for breach of duty to negotiate in good faith); EQT Infrastructure, 861 F. Supp. 2d at 231 (alleged insistence on condition that was inconsistent with parties' preliminary agreement supported claim for breach of duty to negotiate in good faith).

The fact that the LOI was not a binding agreement for the purchase and sale of the Whirlwind technology does not alter this court's conclusion that the question whether Balolia acted in good faith should be determined at trial. As described above, there is nothing inappropriate about a party's effort to renegotiate the financial terms of a nonbinding LOI, as long as that party has a legitimate business justification for its conduct. See West Palm Beach Hotel, 626 Fed. Appx. at 42-43 (finding no bad faith where seller's demand for increased sale

price was financially justified by increase in market value of property); L-7 Designs II, 964 F. Supp. 2d at 308 (no bad faith where negotiations fail for bona fide business reasons). Here, however, Butler has introduced sufficient evidence to support an inference that Balolia's demand for a price reduction was unjustified by any legitimate business interests. For example, Butler has presented evidence indicating that Balolia's demands for a price reduction occurred within days after the parties executed the LOI. (See PF ¶ 27, 30-31). He has also presented evidence showing that the concerns expressed by Balolia's patent counsel after the LOI was signed were the same as the concerns that Balolia had expressed during the parties' negotiation of the LOI. (See PR ¶ 25; Pl. Ex. 4 at 59-61; see also Def. Ex. 13 at B0000898). A factfinder could reasonably conclude that Butler had already accounted for those risks by agreeing to lower the purchase price from $3 million to $2.1 million in the first place, and that Balolia's demands for a further reduction were inappropriate.

Balolia suggests that his conduct in demanding a reduction in the purchase price was predicated on information obtained by Salmon during due diligence, and that there was nothing inappropriate about his efforts to change the financial terms of the deal on this basis. (See Def. Mem. at 14-15; Def. Reply Mem. at 12-14). In particular, the defendant notes that Salmon's law firm billed him over $50,000 for more than 100 hours of legal work. (Def. Mem. at 15). He argues that this evidence, which is undisputed, is inconsistent with a claim that he was acting in bad faith. (Def. Reply Mem. at 14). While a jury viewing this evidence may come to this conclusion, it could also find that Balolia's demand for a price reduction had nothing to do with Salmon's due diligence, and was motivated instead by a desire to sabotage the deal at the price the parties had previously agreed upon.

The record establishes that during his trip to Massachusetts on May 7, 2012, Salmon informed Calhoun that Balolia would not be paying $2.1 million to purchase the Whirlwind technology. (PF ¶ 31). However, it was only after Salmon returned home from the trip that he wrote to the plaintiff, in an email dated May 9, 2012, to request a USB memory stick containing the development and patent records relating to Butler's technology. (Def. Ex. 10). Accordingly, a jury could reasonably determine that Balolia's efforts to alter the terms of the parties' arrangement began well before any due diligence was completed.[8] In fact, in his May 9, 2012 email, Salmon indicated that the defendant was reluctant to move forward with any discussions at all unless the parties could "negotiate a new deal" to reflect the risks that the defendant had already identified. (Id.). Because the record is sufficient to show that the parties had already accounted for those risks when they agreed to the $2.1 sale price, a jury could reasonably conclude that Balolia was acting in bad faith. See L-7 Designs II, 964 F. Supp. 2d at 308 (describing bad faith to include renouncing the deal, abandoning negotiations or insisting on conditions that do not conform to the preliminary agreement).

Balolia argues that his May 21, 2012 proposal, in which he offered to pay Butler $300,000 upon the signing of a purchase agreement, and additional payments totaling $1.6 million if certain contingencies were met, provides substantial evidence that he was acting in

---

[8] Balolia argues that Butler's decision to withhold critical patent-related information from him "effectively prohibited Balolia from even completing his due diligence[,]" and that this fact alone warrants summary judgment in his favor. (Def. Reply Mem. at 14-16). This court disagrees that Balolia is entitled to relief on this basis. As described above, the record demonstrates that Butler withheld numerous technical documents from Balolia until June 2012, when he sent the defendant a copy of his patent application and a thumb drive containing voluminous records. (See PF ¶¶ 62-66). Nevertheless, because a jury could reasonably infer that Balolia's demands for a price reduction were unrelated to his due diligence, and were instead indicative of his desire to scuttle the deal, this evidence is insufficient to defeat Butler's contract claim.

good faith. (Def. Mem. at 15). Similarly, the defendant contends that his willingness to nego-tiate with Butler even after the plaintiff filed a lawsuit against him demonstrates his compliance with his obligations under the LOI. (Id. at 15-16). Again, however, this court finds that the question whether Balolia carried out his duty to negotiate in good faith must be resolved at trial. Although a jury could view these facts as persuasive evidence that the defendant satisfied his obligations, a jury viewing the same facts in the light most favorable to Butler could find that they support the plaintiff's breach of contract claim. Thus, a jury could reasonably determine that Balolia's proposed financial terms were so clearly inconsistent with Butler's expressed desire to monetize his invention, and with Butler's representations that he was unwilling to restructure the financial terms of the LOI, that Balolia knew or should have known that Butler would never accept his proposal. A party may be deemed to be acting in bad faith where its proposal appears "designed to elicit [the other party's] rejection." L-7 Designs I, 647 F.3d at 433. See also Venture Assocs., 96 F.3d at 280 (finding that defendant "would be acting in bad faith ... if its purpose in charging more than [plaintiff] would pay was to induce [plaintiff] to back out of the deal"). Because a reasonable factfinder could infer that this is what Balolia was intending to accomplish in this case, the question of good faith cannot be resolved at this stage in the litigation.

Ordinarily, "[a] finding of good faith, like a finding of negligence or possession, is treated as a finding of fact[.]" Venture Assocs., 96 F.3d at 280. Because this court finds that the facts relating to Butler's breach of contract claim, as well as the conclusions that may reasonably be drawn from those facts, remain in dispute, the defendant's motion for summary judgment is denied with respect to Count II of the Second Amended Complaint.

**D. Count III: Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing**

Butler's final claim against Balolia, which is set forth in Count III, consists of a claim for breach of the implied covenant of good faith and fair dealing. Balolia has moved for summary judgment on this claim on the grounds that "there is no independent, implied duty of good faith and fair dealing that is in addition to the duties existing in the contract to negotiate." (Def. Mem. at 16). For the reasons described below, this court finds that Count III is redundant of Butler's breach of contract claim. Therefore, the motion is allowed with respect to this claim.

"Under Washington law, '[t]here is in every contract an implied duty of good faith and fair dealing' that 'obligates the parties to cooperate with each other so that each may obtain the full benefit of performance.'" Rekhter v. State, Dep't of Soc. & Health Servs., 180 Wash. 2d 102, 112, 323 P.3d 1036, 1041 (2014) (quoting Badgett v. Sec. State Bank, 116 Wash. 2d 563, 569, 807 P.2d 356 (1991)). Because the implied duty "'arises only in connection with terms agreed to by the parties'" in their substantive agreement, it "cannot add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties." Id. at 113, 323 P.3d at 1041 (quotations and citations omitted). The implied covenant of good faith and fair dealing "requires only that the parties perform in good faith the obligations imposed by their agreement." Badgett, 116 Wash. 2d at 569, 807 P.2d at 360.

As described above, the only contractual obligation imposed on Balolia by the LOI was to negotiate in good faith and attempt to agree on the terms of a separate Purchase Agree-ment. Because the parties' substantive contract already required the defendant to perform in good faith, Butler's claim for breach of the implied covenant of good faith and fair dealing is repetitive of his claim for breach of contract. Therefore, the motion for summary judgment is

allowed with respect to Count III.  See L-7 Designs, 647 F.3d at 434 n.17 (noting that the plaintiff's claim for breach of the implied covenant of good faith and fair dealing should have been dismissed because it was redundant of its claim for breach of contract based on failure to negotiate in good faith).

### IV.  CONCLUSION

For all the reasons detailed herein, the "Defendant's Motion for Summary Judgment" (Docket No. 114) is ALLOWED IN PART and DENIED IN PART.  Specifically, the motion is allowed with respect to Butler's claims for declaratory judgment and breach of the implied covenant of good faith and fair dealing set forth in Counts I and III of his Second Amended Complaint, but the motion for summary judgment is denied with respect to the breach of contract claim set forth in Count II.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge